UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80159-CIV-MIDDLEBROOKS/JOHNSON

CHRISTOPHER BIVINS,

    Plaintiff,

vs.

WRAP IT UP, INC. d/b/a NATURE'S
WAY CAFÉ, ANNIE RASO, and
NATURE'S WAY CAFÉ
FRANCHISING, LLC

    Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    This case came before the Court for a non-jury trial on October 15 through October 16, 2007, to determine whether Defendants engaged in race discrimination in refusing to serve Plaintiff during his visit to the Nature's Way Café.  Having received documentary and testimonial evidence, having considered the demeanor and credibility of each witness, having heard arguments of counsel, and being otherwise fully advised in the premises, the Court makes the following findings of fact and conclusions of law.

**I. Findings of Fact**

    This suit centers around a brief visit to the Nature's Way Café, located in the Shoppes of Atlantis, in Lantana, Florida, on March 23, 2006.  Plaintiff Christopher Bivins ("Bivins") is an African-American male who was twenty years old at the time of the incident giving rise to this lawsuit.  Defendant Wrap it Up, Inc. is a franchise restaurant purchased by Defendant Annie Raso ("Raso") and her long-time domestic partner, Catherine Gillot ("Gillot").

On March 23, 2006, in the early afternoon just after the "rush hour," Bivins walked into the restaurant to purchase lunch for himself, his mother, Nancy Edwards, and two of his mother's co-workers, Elizabeth "Beth" Edwards (no relation to Bivins or Nancy Edwards) and Jo-Ann Golden. The three women work at the Lake Worth Community Development Corporation ("CDC").

Because he was unfamiliar with the menu, Bivins entered the restaurant, took a menu, and sat at a table for approximately five minutes to read the menu and decide what he wanted to eat. He used his cell phone and spoke with either his mother or Beth Edwards to clarify their order.

Raso noticed Bivins enter the restaurant, saw him sitting at the table and speaking on the phone, and was standing near Shannon Smith ("Smith"), who worked as a cashier and is herself an African-American, when Bivins placed his order. After taking his order, Smith told Bivins the total was approximately $24.00. Bivins took out his wallet, but only had $21.00. Bivins told Smith that he needed to go to an ATM to retrieve more money.

Raso overheard Bivins' order and his statement that he needed to retrieve money from an ATM machine. Raso then demanded that Bivins leave. In a loud voice, she confronted Bivins and shouted that he had been there previously, placed a large order, said he was leaving to get money, and did not return. Bivins told Raso she was mistaken and that he had never been in the restaurant before that day.

Smith described the scene as a "spectacle" that "stopped everyone dead in their tracks." Gillot, who was working nearby in the restaurant at the time, attempted to reason with Raso. Afraid Raso might have a heart attack, Gillot told Raso to calm down and stated that she did not believe Bivins was the same person. Raso, however, was adamant. She eventually came from

2

behind the counter and continued to scream in Bivins' face that he was the same person who had previously placed a large order and failed to pay for it.

Raso yelled that she was going to call the police. At 2:10 p.m., Raso called the Atlantis Police Department on the 911 emergency line, identified herself, and complained that a patron was causing a disturbance and not paying for his meal. In this call, Bivins was described as an "unwanted guest." Police Chief Mangold was dispatched to Nature's Way. Bivins and Raso waited outside the restaurant until he arrived.

When Chief Mangold arrived, he spoke with Raso, who told him that Bivins had a habit of ordering large meals and not paying for them. Chief Mangold issued a warning to Bivins that if he returned to the restaurant, he would be arrested for trespassing. Chief Mangold testified that the warning still remains in effect.

Bivins left and drove to the CDC, where his mother, Beth Edwards, and Jo-Ann Golden asked why he was empty-handed. Bivins described what had occurred and was visibly upset. Beth Edwards then placed a call to Nature's Way and asked to speak to the manager. Raso told Edwards that there were all women working in the store, and that, when a young Black man comes in "acting strangely," she had a duty to protect her employees. Raso stated either that she had been scared or that Smith, the cashier, had been scared. Smith testified that she was not scared of Bivins. Raso then asked Edwards, "Well, if you were all women working in a restaurant and a young black man comes in, how would you feel?" Raso hung up on Edwards, ending the conversation.

A short time later, Raso called back to the CDC. Beth Edwards answered the phone. Jo-Ann Golden could hear Raso screaming through the phone, and she told Beth to give her the phone. Golden asked Raso why she had refused service to Bivins. Raso told her that Bivins was

"acting strange." She did not describe what she meant by "strange," and Golden did not ask her. Raso also told Golden that she had experienced a problem or disturbance in the past with a Black man or Black men in her restaurant that made her nervous.

Later that day, Raso realized her actions towards Bivins were not justified. She and Gillot had already been the subject of customer complaints in the few short months they had operated the franchise. That night, she called Smith and told her that she (Raso) was afraid she would be in trouble with the franchisor (referred to as "corporate") about what happened that day. Raso told Smith she wanted her to talk to "corporate" on Raso's behalf, and that Raso would tell Smith what to say. Smith, a new employee who was afraid she would lose her job if she refused, agreed to do what Raso asked.

The next day, Raso took Smith into the back office, where she shut the door and called one of the representatives of the franchisor. Raso put the phone on a speaker setting and, as the woman with whom they were speaking would ask a question, Raso would write down on a legal pad what she wanted Smith to say. Smith complied.

Bivins believed Raso's behavior was based on his race and contacted the ACLU, which referred him to the Palm Beach County Office of Equal Opportunity ("OEO"). He filed his Charge of Discrimination on April 21, 2006.

The OEO requested information from Defendants about the incident, and asked that they provide a "Position Statement." Raso represented herself and the business during this investigation. The OEO received a handwritten document from Raso, postmarked on May 2, 2006. In that Position Statement, Raso stated that Bivins was screaming about discrimination, that he came into the store and sat at a table by himself for "a good 15-20 minutes" just staring at the menu, and that he was "acting strange." Raso stated that Smith, the cashier, asked Raso to

4

stand nearby if Bivins came to the register and that Smith was getting scared. Raso stated that, when Bivins took out his wallet, neither she nor Smith could see any money in it. Raso stated that she told Bivins politely to leave the store and that he could come back when he had the money, and that Bivins screamed that she did not "serve black men." Raso wrote that "it was nighttime [sic] and dark outside with 3 women in the store working and 3 to 5 customers all women eating." She stated that they had a lot of Black men at night coming from the gym. Raso stated that Bivins refused to open his wallet when the police arrived. She stated that when she received the telephone call from Beth Edwards (whom she did not identify by name in her Position Statement), Raso told Edwards they could send Bivins back and she would give them the order for free.

      The file was assigned to OEO Investigator Angela Smith ("Investigator Smith") on May 17, 2006. On June 5, 2006, as part of her investigation, Investigator Smith conducted a telephone interview of Raso, during which she typed contemporaneous notes of the conversation. She asked Smith about the timing of the incident. Raso told Investigator Smith that Bivins came into the restaurant in the evening and insisted that it was dark outside. Raso said that there were three female customers in the restaurant, in addition to female staff, and said that Smith, the cashier, had asked her to stand next to the cash register because she (Smith) was frightened of Bivins. Raso told Investigator Smith that, because it was night, it was understandable that everyone was frightened of Bivins. She also told her that Bivins was sitting at a table just staring, as though he were "casing the place." Raso told Investigator Smith that Bivins had been very abusive in his language, that he was loud and extremely irate, and that she felt very threatened. At the conclusion of the telephone conversation, Raso said, "Off the record, would you not have reacted that way if there were just women everywhere and this threatening black

man came in acting strange?" Investigator Smith told Raso that nothing was off the record and that the OEO is a neutral agency.

Investigator contacted Shannon Smith that same day, June 5. During her investigation, Investigator Smith discovered that the restaurant closed at 4:00 p.m. On July 25, 2006, Investigator Smith again spoke with Raso. Raso told her that the incident occurred at night. Investigator Smith informed her that she had facts supporting that the incident occurred during lunch hours, that the restaurant closed at 4:00 p.m., and that Shannon Smith did not work at Nature's Way at night. Raso continued to insist that it was at night and asked Investigator Smith to call Shannon Smith again.

On August 14, 2006, Investigator Smith spoke with Raso by telephone. She explained that the investigation was complete and that the report was being written. Raso asked whether the findings were in her favor. When Investigator Smith began to share her findings and tell Raso that Investigator Smith was going to recommend a finding of probable cause, Raso stated that she remembered that her business partner was present at the time of the incident and could provide a statement. On August 27, 2007, the OEO received an unsworn, notarized letter from Catherine Gillot. Gillot's letter included some of the misrepresentations Raso had previously stated.

The Palm Beach County OEO issued a "Determination of Probable Cause" and Bivins subsequently filed the instant action on February 20, 2007.

At trial, Ms. Raso has admitted that her statements to the franchisor and the Palm Beach County OEO and during her deposition in this proceeding were untrue. She admits that Mr. Bivins did not shout at her, or act in a strange manner. She also admits that she asked Shannon Smith to support her untruths. She now explains that her actions were caused by illnesses and

medications that were affecting her behavior. She says that these medications would cause her to become enraged. She claims to have reacted badly to customers on other occasions and her behavior was not motivated by race. Her partner and co-owner of the corporate defendant, Ms. Gillot, has also admitted that she also lied to the OEO and during deposition in this case in an effort to cover up the behavior of Ms. Raso on the day in question.

## II. Jurisdiction

Plaintiff alleges violations of Title II of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000a, *et seq.*, 42 U.S.C. § 1981, the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760 *et seq.*, and Section 15-57 of Article III of the Palm Beach County Code.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § § 1331, and 1343, and 1367.

## III. Conclusions of Law

The parties have stipulated, and the Court agrees, that the public accommodation claims under Title II of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000a, *et seq.*, Section 1981 claims, and FCRA claims all apply the same prima facie standards and burdens of proof as do employment discrimination claims under Title VII of the Civil Rights Act of 1964, as amended. *Peterson v. BMI Refractories*, 132 F.3d 1405, 1412 n.13 (11th Cir. 1998) (Section 1981 and Title VII). Chapter 15, Article III of the Palm Beach County Code largely reflects the language of FCRA; therefore, the same legal analysis will be applied to that claim, as well.

Bivins' claims require a showing: "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities in the statute." *Jackson v. BellSouth Telecomms.,* 372 F.3d 1250, 1270 (11th Cir. 2004). Here, the parties agree that 1) Bivins is a

member of a racial minority (he is African-American), and 2) the activity concerned an activity enumerated in the statute (namely, the right to make and enforce contracts). Thus, only the second prong is at issue – whether Defendants intended to discriminate on the basis of race.

Plaintiff may prove a *prima facie* case of a disparate treatment claim through direct evidence of discrimination or circumstantial evidence of discrimination. *Burke-Fowler v. Orange County*, 447 F.3d 1319 (11th Cir. 2006). I will address both theories in turn.

**Direct Evidence**

Direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 n.6 (11th Cir. 1987). Evidence that is subject to more than one interpretation does not constitute direct evidence. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citations omitted) (collecting cases).

I find that Bivins has presented direct evidence that Defendants intentionally discriminated against Bivins on the basis of his race. While she used no racial epithet, Raso unambiguously made statements to three individuals that she acted as she did because Bivins is a Black male. Her comments "Well, if you were all women working in a restaurant and a young black man comes in, how would you feel?" and "Off the record, would you not have reacted that way if there were just women everywhere and this threatening black man came in acting strange?" require no inference or presumption. I note that this is especially true when examined in context. Raso's comments, coupled with her lies to corporate and the OEO, demonstrate that she discriminated against Bivins on the basis of his race.

Defendants argued that Raso's statements were merely descriptive of Bivins. Otherwise, they offered no other interpretation of Raso's statements. In context, however, these descriptive

8

comments reveal Raso's intent and motivation. To cover up her own behavior, she asked whether others would be afraid if they were alone with other women and a black man comes into a restaurant at night acting strangely. To justify her actions, the only thing she was able to point to was the race of the plaintiff. When she says she could just have easily said that women were alone in the restaurant and a white man came in, I did not find her testimony credible. The only thing she was able to articulate that made him threatening was his race.

**Circumstantial Evidence**

Even if Raso's statements did not constitute direct evidence of discrimination, I find that Bivins has established his racial discrimination case through circumstantial evidence.

In cases where a plaintiff has no direct evidence of discrimination, courts generally use the burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jackson*, 413 F. Supp. 2d at 1355. In the context of a § 1981 claim, a plaintiff establishes a *prima facie* case of discrimination by producing evidence that: 1) the individual is a member of a protected class; 2) the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute, i.e., the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and 3) the defendant treated the plaintiff less favorably with regard to the allegedly discriminatory act than it treated other similarly-situated persons outside of the individual's protected class. *Id.* (citation omitted). This third prong requires a plaintiff to show a "comparator of a different race who was not subjected to the same harsh treatment with regard to the enforcement of a contract as was the plaintiff." *Id.* The Sixth Circuit recently altered the *prima facie* case to account for the difficulty of finding a traditional comparator when bringing a public accommodations claim. *See Christian v. Wal-Mart Stores,*

9

*Inc*, 252 F.3d 862 (6th Cir. 2001). The Eleventh Circuit has not articulated a *prima facie* test to apply in public accommodations, as opposed to employment, cases. *Kinnon v. Arcoub, Gopman & Assocs.,* 490 F.3d 886, 893 (11th Cir. 2007). I need not adopt a *prima facie* test, because I find that Bivins' claim satisfies both formulations.

I find that Bivins has established his *prima facie* case. Defendants do not dispute that Bivins is a member of a protected class as an African-American or that the alleged discriminatory conduct is covered by the statute. Defendants dispute that Bivins has presented any evidence of a comparator. It is unclear whether the high standard for comparators in the employment context should be applied with equal strength in the restaurant context. *Alford v. Cordele Foods, Inc.*, 2007 U.S. Dist. LEXIS 72588 (M.D. Ga. Sept. 30, 2007). While the comparators need not be identical to Plaintiffs to demonstrate Plaintiffs were treated less favorably than those outside Plaintiffs' protected class, "there should be a reasonably close resemblance of facts and circumstances*.*" *Slocumb v. Waffle House, Inc.*, 365 F. Supp. 2d 1332, 1339 (N.D. Ga. 2005) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94 (2d Cir. 2001) (citation omitted)).

Bivins has produced evidence that there were others who had ordered and were eating in the restaurant at the time the incident occurred. Therefore, they were not treated as he was treated. At trial, Defendants argued that the Court should require Bivins to produce a similar comparator, one who perhaps came in in torn shorts, threw food, or otherwise caused a disturbance. However, the evidence produced at trial indicated that Bivins did none of these acts. In fact, Bivins did not engage in any act that could be called remotely similar to those Defendants state. It is illogical to require a comparator that does not, in fact, compare to Bivins

10

during the incident in question. Thus, Bivins has satisfied this third prong and, thus, has established his *prima facie* case.

Bivins has also satisfied the Sixth Circuit's articulation of the third prong of the *prima facie* test, stated in *Christian v. Wal-Mart Stores, Inc*, 252 F.3d 862 (6th Cir. 2001). That formulation dictates that a Plaintiff can satisfy the third prong of the *prima facie* test if he can demonstrate he did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that: a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or b) they received services in a markedly hostile manner and in a manner in which a reasonable person would find objectively unreasonable. *Christian*, 252 F.3d at 871. The *Christian* test appears to apply the *McDonnell Douglas* framework in a manner that accounts for the fact that a one-time visit to a restaurant may be too transient to establish a traditional comparator. *Brooks v. Collis Foods*, 365 F. Supp. 2d 1342, 1356 (N.D. Ga. 2005).

Bivins has presented strong evidence that he "received services in a markedly hostile manner and in a manner in which a reasonable person would find objectively unreasonable." *Christian*, 252 F.3d at 871. Those who witnessed the incident at Nature's Way portrayed Raso's behavior as unreasonable and irrational. Raso herself admits she acted improperly. Gillot, Raso's partner, attempted to calm Raso down, to no avail. Raso went so far as to force Bivins out of the restaurant and called the police, who warned Bivins that if he were to return, he would be arrested for trespassing. It can easily be said that Raso acted in a markedly hostile manner which a reasonable person would find objectively unreasonable. Thus, Bivins has established his *prima facie* case.

Because I find that Bivins has established his *prima facie* case, Defendants must "articulate some legitimate, nondiscriminatory reason" for the adverse action and must produce some evidence supporting that reason. *Brooks,* 365 F. Supp. 2d at 1356 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant meets its burden of production, the plaintiff must present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination. *Id.* The burden on the defendant is "exceedingly light." *Perryman v. Johnson Prods. Co., Inc.,* 698 F.2d 1138, 1142 (11th Cir. 1983). It is a burden of production, not persuasion, and involves no credibility assessment by the court. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Here, Defendants stated that Raso thought Bivins was another customer who had ordered large meals and failed to pay for them. This is a nondiscriminatory reason for Raso's actions and, as such, it satisfies Defendants' burden of production. I turn next to whether Bivins demonstrated that Raso's stated reason was a pretext for discrimination.

Once the defendants meet its burden of production, the burden shifts back to the plaintiff to demonstrate that the defendants' actions were not for the proffered reason but were, in fact, motivated by race. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07 (1993); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981). Plaintiff bears the ultimate burden of proving that he was the victim of intentional discrimination. *Laroche v. Denny's Inc.*, 62 F. Supp. 2d 1375, 1383 (S.D. Fla. 1999).

The Court finds that Bivins has met this burden and has sufficiently demonstrated that Defendants' explanation is a pretext for discrimination. Defendant Raso has offered several shifting reasons for her actions: 1) she said that he was a customer who on a previous occasion had not paid; 2) then that he was a strangely acting black man who was frightening; 3) that she

and three other women were frightened by an intimidating black man at night; 4) medical reasons and drugs.  Furthermore, after the incident, Raso held telephone conversations in which her comments after the fact indicate she acted on the basis of race.  "Well, if you were all women working in a restaurant and a young black man comes in, how would you feel?" and "Off the record, would you not have reacted that way if there were just women everywhere and this threatening black man came in acting strange?" strongly suggest that she acted on the basis of race.

This is true especially in light of Raso's lies about the incident.  She lied to the franchisor, enlisting Shannon Smith to help her, and then Raso later lied more than once to Investigator Smith of the OEO, an governmental agency.  Among other representations, Raso repeatedly stated that the incident occurred at night, despite evidence that the restaurant closed at 4:00 p.m.  She was untruthful about both her actions and those of Mr. Bivins.  She accused him of acting strangely, casing the restaurant, shouting at her, refusing to leave the restaurant and making a number of statements he never made.  She stated that she was asked by the cashier to stand by her because the cashier was afraid, which was also not true.  Her repeated efforts to cover up her own misconduct by reference to Mr. Bivins' race, reflect the absence of any legitimate, nondiscriminatory reason for her actions.

**IV. Damages**

   **Compensatory Damages**

Turning to the issue of damages, Bivins has shown that he was humiliated and embarrassed, and there is evidence from family members, friends, and work associates that he continues to be affected by the incident.  While this incident was a brief encounter, Bivins testified at trial that whenever he walks into a restaurant, he worries about whether he will be

treated in the same manner.  Nevertheless, although the incident was traumatic and humiliating to Bivins at the time it occurred, Bivins has not suffered lasting damage from the incident, and I do not believe substantial damages are appropriate.  However, that brief incident did include being forced from the restaurant and having the police come and issue a warning that if he were to return to the restaurant, he would be arrested.  For these reasons, I will award Bivins $5,000 in compensatory damages on his claims under  § 1981 and FCRA, § 760.01 *et seq.*, Florida Statutes.  This liability is to be shared by the two remaining defendants in this litigation, Annie Raso and Wrap it Up, Inc., jointly and severally.

**Punitive Damages**

Punitive damages are an available remedy under § 1981.  *Splunge v. Shoney's, Inc.,* 97 F.3d 488, 491 (11th Cir. 1996).  To recover punitive damages, "the complaining party" must demonstrate that the defendants "engaged in . . . discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." *Id.* at 491 n.1. "Malice" means "with an intent to harm" and "recklessness" means "with serious disregard for the consequences of [one's] actions." *Id.* at 491 (citation omitted).  To be entitled to punitive damages, a plaintiff must demonstrate that the defendants acted with knowledge that their actions may have violated federal law. *Kolstad v. American Dental Association*, 527 U.S. 526 (1999).   The defendants not be aware that they are engaging in discrimination; instead, they need only act "in the face of a perceived risk that its actions will violate federal law." *Id*. at 536.  A plaintiff may also "establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001); *see also EEOC v. Wal-Mart Stores, Inc.,* 35 Fed. Appx. 543 (9th Cir.

2002) (finding that, because it was relevant to a determination of punitive damages, the district court abused its discretion by excluding evidence that Wal-Mart attempted to cover up its discriminatory conduct after the relevant incident); *Davis v. Rennie,* 264 F.3d 86 (1st Cir. 2001) (stating that defendants' actions subsequent to the date in question may justify an award of punitive damages).

I conclude that Defendants acted with malice or reckless indifference. Ms. Raso confronted Bivins, called the police, and had him barred from the premises under threat of arrest. Further vilifying Mr. Bivins with repetitive invocation of his race, Ms. Raso, and her corporation through her actions and those of her partner, lied to the OEO and even at deposition in this case to cover up their discriminatory action.  In lying to a public agency charged with enforcing anti-discrimination laws and most certainly in a federal court proceeding charging race discrimination, the Defendants had knowledge that their actions may violate federal law. Ms. Raso went so far as to force Shannon Smith, the cashier, help her cover up what actually occurred during the incident.  For these reasons, the Court will award a total of $5,000 punitive damages as follows: $2,500 assessed against Defendant Raso and $2,500 assessed against Defendant Wrap it Up, Inc.  I emphasize that this relatively small punitive award does not fully reflect my view of the serious magnitude of the conduct at issue in this case, but instead results from my understanding of the Defendants' limited financial resources.

### Injunctive Relief - Title II Claim

Bivins also seeks injunctive relief pursuant to Title II of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000a, *et seq*.  In order to claim injunctive relief, a plaintiff must show a "real or immediate threat that the plaintiff will be wronged again--"a likelihood of substantial and immediate irreparable injury.' " *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)

(quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). In order to claim injunctive relief, a plaintiff must show "real or immediate threat that the plaintiff will be wronged again - a likelihood of substantial and immediate irreparable injury.'" *Jackson*, 130 F.3d at 1007 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Chief Mangold testified that under his understanding of Florida law, the warning he issued remains in effect and Mr. Bivins could be arrested if he returned to the restaurant. I therefore direct Defendants to immediately advise the Atlantis Police Department that the trespass warning was inappropriate and that Mr. Bivins may, if he chooses, return to the premises.

**Civil Penalty (Section 15-54, Article III, Palm Beach County Code)**

Section 15 of Article III of the Palm Beach County Code provides that a court may award actual and punitive damages and my impose fines for each violation of Article III of the Code. The relevant fine provision in this case provides that the court may impose a fine of "[u]p to ten thousand dollars ($10,000) if the respondent has been adjudged to have committed an unlawful discriminatory practice."

While not binding on this Court, the county ordinance provides an indication of one legislative body's idea of what should be an appropriate sanction in cases of unlawful discrimination. The Court is to consider the nature and circumstances of the violation, the degree of culpability, the history of prior violations of this article, the financial circumstances of the respondent, and the goal of deterring future violations. While I have considered the Palm Beach County Code in arriving at the punitive damage award, I find no additional fine is appropriate given the limited financial resources of the Defendants.

**Attorney's Fees and Costs**

The Court reserves judgment on the issue of attorney's fees and costs.

Accordingly, for the reasons set forth in the Court's conclusions of law above, judgment shall be entered by separate order in favor of Bivins.

DONE AND ORDERED in Chambers, in West Palm Beach, Florida, this 18th day of October, 2007.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to counsel of record